SAMUEL, Judge.
During 1963 plaintiff, a sweet potato canning company with a plant in Opelousas, Louisiana, decided to pack the same size can (described as a #3 “squat” or a 404) with two different sizes and quantities of potatoes. As the cans were to be run on the same conveyor belt, handpacked with potatoes, filled with cooking syrup and soldered, and the potatoes cooked, before the cans were labeled, it was necessary to devise some means of identifying the cans containing the smaller potatoes as opposed to those containing the lesser quantity of larger potatoes. Plaintiff planned to solve this problem by marking the cans which would contain the smaller potatoes before they were packed by its employees. The process necessitated the use of a strip marker and quick-drying ink. Because the cooking syrup was pumped in by machine and overflowed the cans and the overflow was recirculated and reused, the ink had to be dry prior to the time the cans went into the syruper or it would be washed off by the overflow and mixed with the recirculating syrup.
On or about September 10, 1963 the production manager of plaintiff’s Opelousas plant talked to a defendant employee by long distance telephone for the purpose of obtaining the necessary- strip marker and quick-drying ink, explaining in detail the use to which the ink was to be put and the process involved. Defendant then sent plaintiff the requested strip marker and two metal containers of ink which defendant had selected. The strip marker and the ink proved to be satisfactory.
On September 27, 1963, by an Alamo Products Company purchase order which was mailed to the defendant, plaintiff’s production manager ordered another supply of the ink. On that occasion he again called the defendant by telephone explaining specifically what he wanted. The ink furnished by defendant in compliance with that order was satisfactory. We reproduce below a copy of the pertinent part of the purchase order of September 27, 1963:

Plaintiff later needed additional ink and on October 23, 1963 its production manager completed and mailed to defendant another Alamo Products Company purchase order.
*725 However, on this occasion he did not telephone or otherwise advise defendant of the specific type of ink desired. We reproduce below a copy of the pertinent part of the purchase order of October 23, 1963:

The ink furnished in compliance with the purchase order of October 23, 1963 was a different type of ink than that furnished in compliance with the first two orders. When the last ordered ink was used by the plaintiff allegedly it contaminated (no contention is made that the contamination was toxic) approximately 2,122 cases of canned sweet potatoes resulting in a loss of $11,246.60, reduced by plaintiff to $9,355.06 during the course of the trial.
Plaintiff then instituted this suit for its alleged loss. Defendant answered, denying any fault on its part and alternatively pleading contributory negligence on the part of plaintiff. After trial there was judgment in favor of the defendant, dismissing the suit. Plaintiff has appealed.
In this court plaintiff contends that, particularly as a result of their prior relationship and the fact that the defendant had been put on notice the ink was to be used for the marking of food containers, defendant breached its contract with plaintiff by forwarding a different type of ink unsuitable for plaintiff’s purposes. It bases its claim primarily in tort and cites no authority other than the tort article, LSA-C.C. Art. 2315. We are of the opinion that plaintiff is not entitled to a judgment under either contract or tort.
Under the facts of this case we conclude the defendant was not negligent in the manner in which it filled plaintiff’s order of October 23, 1963.. The record discloses that “marking” ink has a definite meaning in the trade; it is a general purpose marking ink, comparatively slow-drying, which is used for marking wood, cardboard and other porous surfaces. On the other hand, the ink required by plaintiff is what in the trade is referred to as “Trojan” ink, which is fast-drying and adheres to nonporous substances such as metals, particularly cans. The testimony of the shipping clerk who filled the order is that he interpreted it as calling for a one gallon container (the abbreviated “Con”) of marking ink. This interpretation appears to be reasonable in view of the trade meaning of “marking” ink and the fact that the second letter in “Con” as the same appears in the order, although similar to both the “o” in “gallon” and the “a” in “Marking” does look like an “o” and does not look like an “a”.
Nor does plaintiff’s argument that Alamo was engaged in a food processing business, a fact which was or should have been known to the defendant, make any material difference in the problem we are discussing. There is nothing on plaintiff’s purchase order which indicates its type of business; the pertinent printed portion of the order simply reads “Alamo Products Company”. Nor would actual knowledge of the type of business in which plaintiff was engaged make any material difference. Certainly *726 it could reasonably be assumed that plaintiff needed ink to be used for the marking of cartons and cardboard boxes or packages and “marking” ink was proper for this purpose.
In addition, it was the use of the ink in the canning process which allegedly resulted in the damages sought to be recovered. And we find that, if the contamination actually was caused by the ink plaintiff received in response to its order of October 23, 1963, such contamination resulted from plaintiff’s fault in not wording that order with sufficient clarity and in using the marking ink without first determining the propriety of doing so despite the fact that it should have known the ink was different from the previously supplied Trojan ink. For the record also reveals that: defendant’s invoice for plaintiff’s order of September 27, 1963 is dated September 30, 1963 and bills plaintiff for “1 gal. Trojan ink”, so plaintiff knew or should have known the proper name of the ink they required; the two inks were received by plaintiff in different size and different type containers; to the Trojan ink containers were attached rectangular white and blue gummed labels on which had been typed “Food Container Ink”, while a round white label on which was printed in red “FOR INDUSTRIAL USE ONLY” was attached to the marking ink container; the words “For Industrial Use Only” connote the meaning that the product probably should not be used in connection with the preparation of food; there was a material difference in the price, $25 per gallon for the Trojan ink and $15 per gallon for the marking ink; there is a noticeable difference in the consistency of the two inks, the Trojan ink is thick while the marking ink is thin; and there is also a noticeable difference in the odors of the two inks.
For the reasons assigned, the judgment appealed from is affirmed.

Affirmed.